## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

ICARE CHILD DEVELOPMENT
CENTER LLC and LAUREN DAVIS,

        Plaintiffs,

        v.

ALETHEA CICERO-BROWN,
GEORGIA DEPARTMENT OF
EARLY CARE AND LEARNING
LEGAL SERVICES OFFICER, in her
individual capacity; ALEISHA
GOLDEN, GEORGIA
DEPARTMENT OF EARLY CARE
AND LEARNING COMPLIANCE
MANAGER, in her individual
capacity; AMY M. JACOBS,
GEORGIA DEPARTMENT OF
EARLY CARE AND LEARNING
COMMISSIONER, in her individual
capacity; ELISABETTA KASFIR,
GEORGIA DEPARTMENT OF
EARLY CARE AND LEARNING
COMMISSIONER  OF FEDERAL
PROGRAMS, in her individual
capacity; and IRA SUDMAN,
GEORGIA DEPARTMENT OF
EARLY CARE AND LEARNING
CHIEF LEGAL OFFICER, in his
individual capacity,

        Defendants.

Case No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs iCare Child Development Center LLC ("iCare") and Lauren Davis ("Davis") hereby file this Complaint pursuant to 42 U.S.C. § 1983 and state law against Defendants Alethea Cicero-Brown ("Cicero-Brown"), Legal Services Officer at Georgia Department of Early Care and Learning ("DECAL"); Aleisha Golden ("Golden"), Compliance Manager at DECAL; Elisabetta Kasfir ("Kasfir"), Commissioner for Federal Programs at DECAL; Amy M. Jacobs ("Jacobs"), Commissioner of DECAL; and Ira Sudman ("Sudman"), Chief Legal Officer of DECAL; each in their individual capacities, alleging as follows:

## NATURE OF THE ACTION

1.     Defendants' actions have thoroughly decimated iCare.  In the process, iCare's sole owner and operator, Lauren Davis (formerly known as Lauren Kilby) has lost her livelihood.

2.     Defendants confuse DECAL's discretion to administer a certain federal funding program (discretion DECAL has to some degree), with unfettered discretion to apply rules, regulations, and policies to licensees in any manner it sees fit without due process (discretion DECAL does not have).

3.     Plaintiffs asked Defendants for the bare minimum: a hearing regarding Defendants' many interrelated actions and determinations that led to the abrupt dismissal of iCare, without an adequate explanation for the reasons for the exclusion,

from a funding program that allowed hundreds of underserved iCare families to afford high-quality daycare for their children.   At every turn, Defendants stonewalled this simple request.

4.     Defendants' due process violations did not stop there.  Defendants have continued to take every opportunity to ensure that iCare cannot get back on its feet.

5.     After iCare's unfair exclusion, iCare leased some of its programs to other DECAL licensees – to try to ensure affordable care is available to the families it serves, and in an attempt to salvage some financial benefit from the now empty centers – but Defendants have blocked the lessees from receiving vital CAPS funding.  When asked the basis for this conduct, Defendants have been candid: Defendants are not willing to extend funding to otherwise eligible, qualifying providers if they are – *or Defendants even suspect that they are* – associated in any way with Plaintiffs.

6.     For nearly seven months, Defendants have justified this and other conduct on the basis of a supposedly ongoing "investigation" into alleged "fraud" by Plaintiffs.  But Defendants will not tell Plaintiffs anything about the fraud that was supposedly committed.   Moreover, Defendants' investigatory powers are limited by statute, and this indefinite, damaging investigation into vague and unspecified allegations of "fraud" is not within those powers.

7.     Through the conduct described below, Defendants have violated Plaintiffs' rights protected by the United States Constitution and state law.

## **PARTIES**

8.     Plaintiff iCare Child Development Center LLC is a Georgia limited liability company located at 7 Anniston Avenue, Atlanta, Georgia 30317.

9.     Plaintiff Lauren Davis is a Georgia resident residing at 7 Anniston Avenue, Atlanta, Georgia 30317.

10.     Defendant Alethea Cicero-Brown is a Senior Legal Officer of the Georgia Department of Early Care and Learning, an agency of the State of Georgia located at 2 Martin Luther King Jr. Dr. SE, East Tower, Suite 754, Atlanta, Georgia 30334.

11.     Defendant Aleisha Golden is a Compliance Manager at the Georgia Department of Early Care and Learning, an agency of the State of Georgia located at 2 Martin Luther King Jr. Dr. SE, East Tower, Suite 754, Atlanta, Georgia 30334.

12.     Defendant Elisabetta Kasfir is the Commissioner for Federal Programs at the Georgia Department of Early Care and Learning, an agency of the State of Georgia located at 2 Martin Luther King Jr. Dr. SE, East Tower, Suite 754, Atlanta, Georgia 30334.

13.     Defendant Amy M. Jacobs is the Commissioner of the Georgia Department of Early Care and Learning, an agency of the State of Georgia located at 2 Martin Luther King Jr. Dr. SE, East Tower, Suite 754, Atlanta, Georgia 30334.

14.     Defendant Ira Sudman is the Chief Legal Officer of the Georgia Department of Early Care and Learning, an agency of the State of Georgia located at 2 Martin Luther King Jr. Dr. SE, East Tower, Suite 754, Atlanta, Georgia 30334.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States, and pursuant to 28 U.S.C. § 1367 by which this Court has supplemental jurisdiction to hear Plaintiffs' state law claims, because the state law claims are so related to the federal claims that they form part of the same case and controversy.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), including because a substantial part of the events or omissions giving rise to the claim arose in this district, including that the Plaintiffs conduct business in this district, and Defendants' wrongful conduct occurred in this district.

## BACKGROUND FACTS

**A.     iCare and the CAPS Program**

17.    This case concerns Lauren Davis and her company iCare, which, until recently, provided high-quality childcare services to underserved communities in Georgia.

18.    Since 2011, iCare has owned and operated DECAL-licensed childcare centers in Georgia.  As of 2023, iCare operated eight such centers in Atlanta, College Park, and Toccoa.  Across iCare's eight centers, Davis served hundreds of children and their families.

19.    iCare was able to provide the highest quality care in large part because of its participation in the Childcare and Parent Services funding program ("CAPS").

20.    CAPS is a program administered by DECAL that provides financial assistance to families to help with the cost of childcare.

21.    The CAPS program is largely federally funded through the Child Care and Development Fund via the U.S. Department of Health and Human Services ("HHS").

22.    At all times relevant to this petition, iCare has been an "eligible child care provider" as defined in the applicable HHS regulations.  *See* 45 C.F.R. §§ 98.2, 98.40, 98.41.

**B.**   **DECAL's Audit and Dismissal of iCare from CAPS**

23.    On October 4, 2023, Ms. Davis contacted DECAL to report an administrative error that was causing payment of incorrect rates on hundreds of CAPS scholarships across all of iCare's locations.

24.    Over the following weeks, Ms. Davis exchanged emails with Defendant Golden and others at DECAL.  In these emails, Ms. Davis repeatedly requested explanations regarding DECAL's CAPS-related billing and payment policies but Defendant Golden and her colleagues at DECAL refused to provide those explanations.

25.    On October 24, 2023, without advanced notice, DECAL conducted simultaneous on-site audits of four iCare centers, demanding – during business hours – substantial records including more than one year of certain categories of records.

26.    DECAL's CAPS Policies purport to allow DECAL limitless discretion to show up unannounced and demand providers immediately turn over unlimited records on the spot while also caring for children.  *See* CAPS Policy 12.4.8.4(A)(4) ("If records are requested in person during an on-site review, the provider or any of their representatives must immediately make records available.").

27.    If a provider cannot meet these impossible demands, DECAL claims the authority to dismiss the provider from CAPS.  *See* CAPS Policy 12.4.8.4(A)(5) ("Failure to provide requested documentation immediately upon request shall result

in sanctions imposed by DECAL, including a mandatory reclaim of reimbursement for the overpayment periods that lack the supporting documentation, and may include dismissal or disqualification from CAPS ….").

28.    DECAL's ability to violate providers' due process rights – and target providers DECAL does not like for pretextual reasons – is therefore built into its CAPS Policies.  This is precisely what happened to iCare here, where Defendants dismissed Plaintiffs from the CAPS program for pretextual reasons without notice or a hearing.

29.    Notwithstanding the impossible requests made by DECAL's auditors, the individuals staffing iCare's centers during the October 24 audits were instructed over the phone by iCare's owner, Ms. Davis, to make every effort to attend to the auditors' records requests.

30.    With technological and logistical limitations on the staff's ability to compile that volume of records on the spot, iCare's staff did their best to comply, while also caring for children.

31.    One of iCare's audited centers was able to meet the DECAL auditor's demands.  While the other three audited centers were unable to compile all of the requested records during the onsite audit, surveillance video shows that the staff at these three centers were compliant and helpful during the audits.

32.    Soon after the surprise audits, by email dated October 26, 2023, Plaintiffs promptly offered to provide the remainder of the requested records if given a reasonable amount of additional time to do so.  Plaintiffs explained that they had recently expanded several of its locations, were in the process of completing an internal restructuring in the online records keeping system, and were moving to a fully-online format for student registrations.  Plaintiffs therefore requested the opportunity to gather the remaining requested documents from iCare's old and new records systems.

33.    In the October 26 email, Plaintiffs also expressed concern that DECAL's surprise audits appeared to be retaliatory in nature, initiated as a response to their request that DECAL correct errors that were repeatedly causing payment of incorrect amounts of CAPS funding to be disbursed to iCare.

34.    iCare also reported that one of DECAL's auditors had made an inappropriate comment to the iCare staff during the audit, stating that if DECAL did not receive every requested record on the spot, iCare would be required to pay back millions of dollars to DECAL.  This comment further frightened an already anxious staff.

35.    Plaintiffs' reasonable request for a reasonable amount of time to compile and submit the requested records was consistent with DECAL's own policy

to allow "15 calendar days" for providers to comply with records requests.  *See* CAPS Policy 12.4.8.4(A)(3).

36.    But Defendants refused to accept the records, contrary to the statutory mandate that DECAL "shall assist applicants, license holders, registrants, commission holders, and permit holders in meeting applicable rules and regulations of the department for early care and education programs."  O.C.G.A. § 20-1A-10(j).

37.    On November 1, 2023, Plaintiffs used the appropriate channels to file a grievance report with DECAL regarding the audits, but Plaintiffs never received a response to that report.

38.    By email dated November 2, 2023, however, DECAL did inform Plaintiffs that "a member of the Audits and Compliance team will be reaching out to you soon to discuss the next steps, so you know what to expect going forward.  This typically will include a discussion of the reconsideration procedures that are available if and when an adverse action is issued, as well as a discussion about the options available to you during the appeal process if you choose to avail yourself of these options."

39.    But no one from DECAL's Audits and Compliance team reached out to Plaintiffs.

40.    Instead, on November 9, 2023, Ms. Davis received a call from DECAL stating that all iCare centers were being dismissed from the CAPS program effective

immediately without rights to an appeal, and all scholarships assigned to iCare would expire in one week, impacting more than 400 students and 100 employees.

41.     Notably, DECAL dismissed from the CAPS program: (1) the iCare center that had turned over the requested records during the onsite audit, (2) the other three iCare centers that had been subject to the onsite audits, and (3) other iCare centers that were never subject to onsite audits.

42.     Each of iCare's centers is separately licensed by DECAL.

43.     In a meeting between iCare, iCare's counsel, and Defendants on November 13, 2023, Defendant Sudman vaguely stated that Plaintiffs were under investigation, but provided no additional details regarding this investigation.

44.     During this meeting, Defendant Sudman alleged that iCare was billing for students who lived many hours away from iCare's centers, but iCare has never received anything in writing to this effect that identified any such children, and iCare has never received an overpayment request from DECAL for this alleged issue.

45.     In fact, at all times relevant to this action, Plaintiffs' billing practices were in full compliance with all DECAL and CAPS policies.  Defendants have never demonstrated otherwise.

46.     Defendant Sudman also made numerous false statements during the November 13 meeting, including that certain DECAL's auditors had been denied entry to iCare's centers, and other auditors were told to leave the buildings.

11

47.     By email dated November 17, 2023, counsel for Plaintiffs wrote to Defendants Sudman and Cicero-Brown, requesting answers to basic questions about how DECAL was interpreting and applying its policies against iCare.  In this email, Plaintiff pointed to a number of errors and inconsistencies in DECAL's communications regarding the dismissal.  For example, Plaintiff noted that, in dismissing all of iCare's centers from CAPS, DECAL had cited certain inapplicable policies related to "health and safety" standards.

48.     Plaintiff also asked Defendants Sudman and Cicero-Brown for guidance on how iCare could work to ensure the availability of childcare to the hundreds of families that stood to lose – and ultimately did lose – access to the one of the few, if not the only, affordable childcare options in their respective areas.

49.     Indeed, many of Plaintiffs' centers operated in underserved, low-income areas of Georgia where families generally cannot afford childcare in the absence of CAPS funding, and where childcare options are severely limited.

50.     In dealing with the dismissal from CAPS of *other* childcare providers, Defendants apparently take into account the effect on the impacted children and families.  For example, in an email obtained through an open records request, dated April 12, 2024, Defendant Kasfir stated that if DECAL planned on dismissing "nine facilities all with many families who have CAPS, we may need to space these dismissals in some way."

12

51.     The families attending Plaintiffs' eight facilities received no such consideration, as Defendants summarily dismissed all iCare centers on the same day, leaving hundreds of CAPS scholarship students scrambling for substitute care.  This underscores how eager Defendants were to target and punish Plaintiffs, even if that meant that the very students DECAL purports to serve became collateral damage.

52.     In dismissing iCare from the CAPS program, Defendants also made a number of misstatements to the parents of iCare's students, including that Ms. Davis allegedly failed to cooperate with a request for records, and that DECAL had serious health and safety concerns about one or more of iCare's centers.

53.     For example, on November 15, 2023, DECAL emailed certain parents of children attending an iCare center and stated that the iCare center "is no longer eligible to participate in the CAPS program due to Serious Health and Safety concerns."  This defamatory statement is deeply damaging to Plaintiffs' reputation and business interests, and Defendants have never once identified a single "health and safety" issue with any of iCare's centers.

54.     On November 20, 2023, in response to Plaintiffs' November 17, 2023 email, Defendant Cicero-Brown dodged Plaintiffs' questions and vaguely stated that iCare had been dismissed for unidentified "programmatic violations."  With regard to an appeal or hearing, Defendant Cicero-Brown stated that "DECAL CAPS has not issued … an adverse action that is appealable."

13

55.     Defendant Cicero-Brown further explained that, "[w]ith respect to your client's inquiry on what iCare can do to assist families it serves, DECAL will not get involved in a business decision that's strictly one for your client to make."  As explained below, this turned out to be a lie.

56.     Defendant Cicero-Brown's claim that Plaintiffs have not been subject to an "adverse action that is appealable" relies on another one of DECAL's unconstitutional policies, which purports to classify "[d]ismissal from participation in CAPS" as a non-appealable decision.

### C.     <u>iCare's Request for a Hearing</u>

57.     By letter dated November 20, 2023, iCare timely appealed DECAL's adverse actions.

58.     Among other things, iCare's letter requested the right to appeal and a hearing.

59.     That same day, DECAL responded that DECAL's "decision is final and is non-appealable."

60.     Ms. Davis promptly pushed back and renewed her request for a hearing.

61.     On November 21, 2023, after further exchanges of emails—including Ms. Davis stating that she plainly was being denied due process—Defendant Sudman wrote to Ms. Davis: "There are no next steps, the appeal isn't honored since

there isn't an appealable action.  This matter is final and no further e-mails will be sent on this matter."

62.    On December 5, 2023, Plaintiff wrote directly to Defendant Jacobs to bring DECAL's conduct to the Commissioner's attention.  Plaintiff explained, in great detail, the events of the prior few months, and expressed that Plaintiff would "love to meet with you in person or by phone to share my experience of what preceded the dismissal letters, and answer any questions you may have for me." Defendant Jacobs never responded to this email regarding the misconduct of those under her direct supervision and authority.

63.    By letter dated February 27, 2024, iCare wrote to DECAL to contest DECAL's refusal to hold a hearing related to its decisions regarding iCare, and to formally provide DECAL one final opportunity to provide the required hearing.

64.    In its letter, iCare requested "a hearing on at least the following issues: (1) CAPS payments owed to iCare, (2) iCare's eligibility for CAPS funding, (3) DECAL's audits of certain iCare centers, (4) DECAL's findings with respect to the audits of certain iCare centers, (4) DECAL's dismissal from CAPS certain iCare centers that were never audited, (5) DECAL's application of its recordkeeping and audit policies to iCare, and (6) DECAL's ongoing, harmful conduct towards iCare and Ms. Lauren Davis."

65.    Defendant Sudman responded to counsel the same day, acknowledging receipt of iCare's letter and requesting a call with iCare's counsel.

66.    On the February 27, 2024 call between Defendants Sudman and Cicero-Brown and iCare's counsel, Defendants explained again that iCare and Ms. Davis are "under investigation for fraud," but refused to elaborate on the basis or timing for this investigation.

67.    On March 6, 2024, Defendant Cicero-Brown sent a letter to iCare explaining, among other things, that iCare is "not eligible for a hearing."

68.    In denying iCare a hearing on DECAL's determinations relating to the audits and dismissal of iCare centers from CAPS, DECAL cited inapposite and non-binding authorities, including a 1982 decision of a New York federal court related to immigration.  Among other incorrect statements, DECAL claimed that because DECAL has discretion as to which childcare providers may receive CAPS funding, iCare has "no standing" to challenge determinations relating to the CAPS program.

69.    In denying iCare a hearing on DECAL's determinations relating to the payments of CAPS funds to iCare, Defendant Cicero-Brown incorrectly stated iCare had refused "on multiple occasions to provide supporting documentation that her rates were incorrectly entered which resulted in incorrect payments."  This is flatly contradicted by earlier communications from DECAL to Plaintiffs in which DECAL

16

acknowledged that the chronic underpayment to iCare was due to errors by a DECAL staff member.

70.    Defendants' summary dismissal of iCare from the CAPS program and subsequent stonewalling have resulted in at least $242,550 in CAPS payments begin improperly withheld from iCare by DECAL.

71.    Defendants do not contest that they are withholding funds owed to Plaintiffs for CAPS scholarship-receiving children who attended iCare's centers. Rather, Defendants falsely claim that Plaintiffs have not provided the necessary documentation in order for Defendants to release the funds to Plaintiffs.  This is false, as Plaintiffs have provided all required documentation.

### D.    DECAL Violated its Statutory Obligation to Provide a Hearing

72.    Notwithstanding Defendants' reliance on their supposedly limitless discretion to deny appeals and hearings to providers, Defendants were in fact required to provide Plaintiffs with notice and a hearing before taking the above actions against Plaintiffs.

73.    Section 12 of the CAPS policies concerns "Child Care Provider Rights and Responsibilities" and this section lists O.C.G.A § 20-1A-10.1 as the legal authority for the policies in that section.

74.    O.C.G.A § 20-1A-10.1 provides that "[a] determination by the department [*i.e.*, DECAL] regarding payments and eligibility pursuant to any federal

program or grant shall be preceded by notice and opportunity for a hearing and shall constitute a contested case within the meaning of Chapter 13 of Title 50, the 'Georgia Administrative Procedure Act.'"

75.     The CAPS program receives significant federal funding.

76.     The phrase "shall be a contested case" in § 20-1A-10.1 further underscores iCare's right to a hearing, because under the Georgia Administrative Procedure Act, a "contested case" is defined as "a proceeding … in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing." O.C.G.A. § 50-13-2(2).

77.     Defendants' position that participation in the CAPS program is a mere privilege is therefore of no moment, as a "contested case" includes determinations regarding "legal rights, duties, *or privileges*."

78.     "Any party to a 'contested case' is entitled to, among other things, the following: notice, the right to have subpoenas issued and enforced, to have counsel present, and to respond and present evidence." *Symphony Med., LLC v. FFD GA Holdings, LLC*, 370 Ga. App. 66, 70 (2023), *reconsideration denied* (Nov. 14, 2023).

79.     In a contested case, "the rules of evidence are generally applicable, and a party to the contested case is entitled to cross-examine witnesses and object to evidentiary offerings." *Id.*

**E.    DECAL's Indefinite and Unlawful "Investigation" of iCare**

80.    Defendants have repeatedly indicated that they are supposedly investigating Plaintiffs for "fraud."

81.    DECAL's investigatory powers are proscribed by statute.

82.    DECAL "***shall have the authority to make public or private investigations or examinations*** inside or outside of this state ***to determine whether*** the provisions of this Code section or any other law, rule, regulation, or formal order relating to ***any licensing requirement of a program has been violated***."  O.C.G.A. § 20-1A-12(d) (emphasis added).

83.    But during the pendency of this now *7-month* investigation, DECAL has made clear that iCare's licenses to operate childcare facilities are in good standing.

84.    Plaintiffs have repeatedly requested information regarding the nature and timing of the investigation.  Defendants have not responded.

85.    Upon information and belief, Defendants have a pattern and practice of dismissing providers from CAPS without evidence of wrongdoing.  In an email obtained through an open records request, dated April 12, 2024, a DECAL employee discussed iCare and, in relation to another provider, raised with Defendants Kasfir and Sudman that DECAL's legal department should consider "how we feel about dismissing (or disqualifying) programs with no actual evidence we can see."

**F.      Defendants' Unlawful Interference with Plaintiffs' Business Interests Without Due Process and Defamatory Statements About Plaintiffs**

86.    DECAL has also repeatedly taken adverse actions against others that Defendants believe are affiliated with iCare on the basis of this undisclosed investigation, and those unlawful actions have directly damaged Plaintiffs.

87.    Notwithstanding Defendant Cicero-Brown's representation on November 20, 2023 that, "[w]ith respect to your client's inquiry on what iCare can do to assist families it serves, DECAL will not get involved in a business decision that's strictly one for your client to make," Defendants have interfered with Plaintiffs' attempts to ensure that child care remains available for the families they once served.

88.    iCare is the owner of many of the properties on which iCare formerly operated.  Upon being dismissed from the CAPS program, iCare leased certain of its centers to new providers.  The new providers then applied for CAPS funding but were denied for the express reason that Defendants refuse to approve CAPS funding for anyone who has (or might have) any kind of financial relationship with iCare.

89.    This renders the centers essentially useless to the new providers, which, in turn, interferes with the rights of Plaintiffs and the new providers to do business.

90.    In taking these actions, Defendants cite no policy or other source of authority to wield power in this unfettered manner.

91.    Defendants' failure to cite a legal basis for their interference with Plaintiffs' business interests without due process is not surprising, as the law requires due process.

92.    For example, DECAL's ability to "[p]rohibit any applicant or holder of a license from allowing a person who previously was involved in the management or control," such as Ms. Davis, "to be involved in the management or control of such program" is expressly "subject to notice and opportunity for hearing."  O.C.G.A. § 20-1A-12(c)(4).

93.    During their unconstitutional campaign to destroy Plaintiffs' livelihood, Defendants have also repeatedly defamed Plaintiffs.  When denying CAPS funding to Plaintiffs' lessees, Defendants have told the lessees that Plaintiffs engaged in fraud.

94.    And when those lessees have reached out to a Georgia-based childcare trade association for help, the trade association representatives have told the lessees that their options are limited because DECAL told the trade association that Plaintiffs committed fraud.

95.    Defendants, therefore, while telling Plaintiffs that DECAL cannot share the details of an ongoing investigation, have apparently shared freely with third parties the results of that investigation – results that have never been communicated to Plaintiffs.

21

96.     The irresponsible statements made by Defendants to third parties are false, defamatory, and harmful to Plaintiffs.

97.     Defendants' personal animus towards Plaintiffs is a matter of public record.  For example, in an email obtained through an open records request, dated March 11, 2024, Defendant Golden wrote to her DECAL colleagues in connection with a news story featuring Ms. Davis about DECAL's failure to timely pay providers: "she still thinks she is smarter and has us beat. Something happens to a person when they commit fraud for so long, then they believe nothing can stop them and they become even more brazen."

98.     A colleague responded to Defendant Golden that Ms. Davis' television appearance was "very calculated on her end" and Ms. Davis would seek to "blame CAPS if she is at fault for fraud."  Defendant Golden responded: "No, her fraud was before we went live. The feds will handle her."

99.     This exchange underscores Defendants' intense, personal dislike of Ms. Davis.  But it also reveals that, though Defendants understand Ms. Davis has not been found at fault for fraud, they have nevertheless decided that a finding of fraud is a foregone conclusion.  This may help to explain why Defendants feel empowered to treat Ms. Davis like a criminal even when no investigation has found any wrongdoing.

### G.   iCare's Pending Petition for Judicial Review

100.   On April 5, 2024, Plaintiff iCare filed a Petition for Judicial Review with the Superior Court of Fulton County pursuant to O.C.G.A. § 50-13-19, alleging DECAL failed to follow proper procedures in denying iCare a hearing. *iCare Child Development Center LLC v. Georgia Dept. of Early Care and Learning*, Case No. 24CV004332 (Fulton Cnty. Sup. Ct.).

101.   On May 20, 2024, DECAL moved to dismiss iCare's Petition for Judicial Review, arguing, among other things, that DECAL can dismiss or disqualify providers at its sole discretion.

102.   iCare's Petition for Judicial Review is not sufficient post-deprivation process, particularly because Defendants are challenging iCare's Petition on the grounds that iCare is supposedly not entitled to any due process.

### COUNT I
### 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Due Process

103.   Plaintiff incorporates the allegations contained in Paragraphs 1 through 102 as though fully set forth herein.

104.   Defendants Cicero-Brown, Golden, Kasfir, Jacobs, and Sudman have each deprived Plaintiffs of constitutionally protected property interests without due process of law.

105.   The procedures utilized by Defendants to audit, dismiss, investigate, defame, and interfere with Plaintiffs' business, including as described above, are constitutionally inadequate, including because:

    i.    Defendants have applied to Plaintiffs records and audit policies that are facially unconstitutional;

    ii.    Defendants have applied their records and audit policies against Plaintiffs in an inconsistent, discriminatory, arbitrary, and capricious manner;

    iii.    Defendants dismissed Plaintiffs from the CAPS program for retaliatory and pretextual reasons;

    iv.    Defendants purport to have the authority to dismiss providers, including iCare, from the CAPS program without a hearing and without explanation, contrary to Plaintiffs' due process rights;

    v.    Defendants have deprived Plaintiffs of a significant property rights without a hearing, contrary to Georgia law and the U.S. Constitution;

    vi.    Defendants purport to have the authority to take adverse actions against providers without a hearing, contrary to Georgia law and the U.S. Constitution;

    vii.    Plaintiffs never received any pre-deprivation or post-deprivation opportunity to be heard.

106.   Each Defendant was acting under color of state law when they deprived Plaintiffs of due process as described herein.

107.   At the time of Defendants' wrongful actions, it was clear that they violated established rights and no reasonable actor in Defendants' positions would have acted in such a manner.

108.   Plaintiffs request declaratory judgment to the effect that Defendants have deprived Plaintiffs of due process as described herein.

109.   Plaintiffs request an order enjoining Defendants from further depriving it of its constitutional rights without due process of law.

110.   Plaintiffs further pray for compensatory and uncapped punitive damages, attorneys' fees, costs, and pre-judgement and post-judgment interest against Defendants, jointly and severally.

## COUNT II
### O.C.G.A. § 51-5-4 - Defamation *Per Se*

111.   Plaintiffs repeat and re-allege paragraphs 1 through 110 as if fully set forth herein.

112.   Defendants have made false and defamatory statements concerning the Plaintiffs, including but not limited to Defendants' statements:

    i.      To Plaintiffs' lessees that Plaintiffs committed fraud;

    ii.     To a Georgia childcare trade association that Plaintiffs committed fraud;

    iii.    To parents of children attending or formerly attending iCare programs that iCare violated DECAL's Health and Safety policies.

113.   These false and defamatory statements were unprivileged communications third parties.

114.   Defendants made these false and defamatory statements with intent to injure Plaintiffs or, at the very least, acted negligently.

115.   Plaintiffs were damaged by Defendants' false and defamatory statements, in an amount to be proved at trial.

116.   Though Plaintiffs suffered actual damages from Defendants' false and defamatory statements, Plaintiffs need not prove that they were damaged by Defendants' false and defamatory statements, because the statements concerned Plaintiffs' trade and profession and therefore were *per se* defamatory.

117.   Plaintiffs are entitled to punitive damages for Defendants' willful and wanton conduct.

<u>**COUNT III**</u>
**Breach of Contract**

118.   Plaintiffs repeat and re-allege paragraphs 1 through 117 as if fully set forth herein.

119.   In exchange for Plaintiffs caring for qualifying, low-income students who qualified for CAPS, Defendants agreed to pay to CAPS scholarship funds to Plaintiffs for those eligible children who attended iCare programs.

120.   Plaintiffs performed pursuant to this agreement by providing childcare for CAPS-eligible students at iCare's centers.

121.   Defendants breached, and caused DECAL to breach, this agreement by failing to pay Plaintiffs at least $242,550 in CAPS funds for eligible children who attended iCare programs.

122.   As a direct and proximate cause of Defendants' breach, Plaintiffs have suffered damages in an amount to be determined at trial, and not less than $242,550.

## COUNT IV
### Quantum Meruit

123.   Plaintiffs repeat and re-allege paragraphs 1 through 122 as if fully set forth herein.

124.   Plaintiffs' labor and other resources were valuable to the Defendants, provided at the request of the Defendants.

125.   Plaintiffs expected compensation for each day that a CAPS-eligible student attended one of iCare's centers.

126.   Under the theory of quantum meruit, Plaintiffs are therefore entitled to the full amount of the unpaid CAPS funds that are still due for services rendered, in an amount to be proved at trial and not less than $242,550.

## COUNT V
### Injunctive Relief

127.   Plaintiffs repeat and re-allege paragraphs 1 through 126 as if fully set forth herein.

128.   As set forth above, Defendants' active, ongoing, and repeated violations of Plaintiffs' due process rights and property interests, among other rights, demonstrates that, if not enjoined, Defendants are likely to continue to cause Plaintiffs substantial and irreparable harm.

129.   Plaintiffs do not have an adequate remedy at law for the harm Defendants have already caused and are likely to continue to cause.

130.   The amount of such damages is significant, but difficult to determine specifically.

131.   Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief prohibiting Defendants from continuing to violate Plaintiffs' rights as described herein.

WHEREFORE, Plaintiffs respectfully request:

    i.    A trial by jury on all issues so triable;

    ii.    An order in favor of Plaintiffs and against Defendants finding that Defendants violated Plaintiffs' due process rights;

    iii.    An order in favor of Plaintiffs and against Defendants finding that Defendants breached contractual obligations owed to Plaintiffs or, in the alternative, that Plaintiffs are entitled to recover under a theory of quantum meruit;

    iv.    An order preliminarily and permanently enjoining Defendants' ongoing violations of Plaintiffs' rights;

    v.    Compensatory and punitive damages in an amount to be determined by a jury;

    vi.    Reimbursement of their costs and fees to the extent permitted by law;

    vii.    Such other and further relief as this Court deems just.

Respectfully submitted this 24th day of May, 2024.

**PARKER, HUDSON, RAINER & DOBBS LLP**

*/s/ R. David Gallo*
Jared C. Miller
Georgia Bar No. 142219
R. David Gallo
Georgia Bar No. 228283
303 Peachtree Street, NE, Suite 3600
Atlanta, Georgia 30308
jcm@phrd.com; dgallo@phrd.com
Telephone: 404-523-5300
Facsimile: 404-522-8409

*Counsel for Plaintiffs*